The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. We're here this morning on case number 4-2-2-0-0-8-8. For the appellant, we have Christopher Paul Ryan. Is that correct? That's correct, Your Honor. And for the appellee, we have Mr. Jeffrey Crumpy. Is that correct? Your Honor. All right. Mr. Ryan, you may proceed with your argument on behalf of the appellant. And I'd just like to remind the bailiff I would like to reserve five minutes of my time for the counterclaim. So if I could get a notification on that, that would be great. I'm sure he's done that. Then you'll have your rebuttal. Okay. Thank you. Let's see. To start, I would like to just point out that this case was filed in 2007, and we were litigating it at the end of 2021 and into 22. So this was a 15-year piece of litigation. I believe both Mr. Crumpy and I came in much later. I think I was the last to come in just a few weeks before trial. So many of us were working with old facts, old records, etc. However, a couple of things became clear. And as the court can see from the records that were attached from the trial, we prepared notebooks for each of these entities to show what the purchase price of the properties were, what the sales were, and to lay out what happened to the assets of each of those companies. When you say notebooks, counsel, can you clarify what you mean? Yes. There are a number of exhibits that in the trial court level that were either marked, for instance, C for Centennial, KE for Kickapoo Edwards, or V for Villeneuve. And that was for simplicity, so everybody knew that record attached to that company. And these physical notebooks were actually submitted into evidence without objection, as were many of their business records. There are many, many problems that we've raised with the trial court's order. But at the end of the case, the main problem is this. The court was faced with conflicting testimony, but did not apply any of the normal presumptions that would apply against a partnership or a group where one party maintains control of the records. And I had cited primarily Corey versus Corey, which actually is relatives of some of these people in the case. And the point of that case was, even in a general partnership, if one partner maintains control of the records, they're under a duty to maintain those records. And in fact, it became very clear when I was preparing to assist Mr. Evans in trial of this case that we did not have most of the records. In fact, most of the records that were pulled for these notebooks were done by Mr. Evans going to the recorder of deeds office and tracking down the sales. There's no evidence that after they, well, let me back up and say... Can I ask you a question here, Mr. Ryan? Sure. There seems to be more than one evidence point that suggests that your client's former attorney received documentation. He couldn't really say what it was. They couldn't really say where it went. Doesn't the record suggest that records were exchanged with your client's former attorney early on and contemporaneously? I would disagree with that, Your Honor. Take, for example, the manager. He testified at one point that when he took possession of the records, all he took possession of was two checkbooks, and the remainder of the records were burned by a brother of one of the LaHoods. So then he later on says, oh, I gave all my records to Bruce Tiemann. Now, first of all, both sides were represented by counsel, and we have no record between attorneys that records were being exchanged. We have no record of what was being exchanged. And again, the question becomes this. If that happened, then why doesn't the defendant have those records if they gave them to counsel in the case? In other words, if I send discovery to Mr. Crumpy, I can't say, well, I gave it to Mr. Crumpy. Now I don't have it. Therefore, I'm relieved of my burden to have it. That's essentially what they're arguing. And keep in mind, that testimony is coming from laypeople, not legal counsel. So I don't know what records supposedly went to Tiemann, and I've made the argument. Even the accountant said, well, I think Bruce Tiemann and other attorneys subpoenaed these records, but he can't find the subpoena. He can't find the records. And he swears up and down he would have kept copies of everything he in response to a subpoena, yet he has none of the tax returns that would help us unravel some of this. So I understand the court's finding that testimony is problematic, but it's wholly unsupported by actual evidence, and normal practice and custom, I would say. Some of that, I think we can suggest might be related to the passage of time. But the trial court is in a position to decide whether to credit the testimony that's been given, isn't it? Yes, but the trial court didn't say, well, the records were all given to Mr. Tiemann. The court found that there were missing records, but then said that they didn't breach any duty in not maintaining them. And I think the statute makes it clear that it's the partnership. Whoever at the partnership is responsible for keeping records has a duty to maintain those records. And the other thing I want to say is my client never had those records. What's the cause of action for that? Because you didn't plead destruction of records, right? It was all about provision of records. What's the cause of action that's been pleaded? And what's the relief? Well, in Corey versus Corey, we were doing the same thing. We were saying, well, you violated your partnership ethical duty. You violated your duties as a partner. You kicked me out of the partnership with no basis in the partnership to do it, based on a claim that I hadn't paid costs, which there was evidence that I had, and you refused to explain it to me. And now you don't have the records to back up any of your claims because you've lost them or they're gone. In my brief, I outlined all the people that said they lost records. What's the consequence? I mean, you won. Your claim was reinstated. The defendant's counterclaims failed because of their inability to prove damages. What's the harm done to your client? Your Honor, what the ruling did to my client is said, you have to go back in time and rejoin a partnership where during litigation, for the most part, all of the assets of the corporation had been sold and distributed to other partners, including new partners brought in after you left, and trying to figure out what your share of that is. Isn't that what your client asked for, to rejoin the partnership? Originally. But as I pointed out to the court at trial, now granted, I was the new kid on the block. I get that. But our prayer, and you can amend your prayer at trial. I was amending my prayer to say, we can't do that. First of all, the defendants aren't going to cooperate with that. The court's ruling said, go back and they have to provide the records. Well, if they had them, they would have produced them at trial. I'm sure Mr. Crumpy is not saying there's a cache of records that he didn't produce in discovery in this case, or hadn't been produced. So we're going to go back with nothing more than the record in this case, and try and calculate what we did. I gave the court a breakdown of number one, how we paid, this relates a little bit to the counterclaim, but how we paid the mortgages on each of these properties. And number two, tracked all the sales that we were not allowed to participate in, which showed what we should have received when those sales were going. Now granted, those sales should have been net of certain expenses, except they have no closing statements and no way to prove any of those expenses. The only closing is the one, the last of the centennial properties, and that's the one the court seized on. Returning to my question, what relief did you ask for as a result of the non-production of documents? I asked the court to work presumptions against them to find that they had not met their duty and to pay us our fair share of the sale of the centennial properties, our fair share of the sale of the Kickapoo Edwards properties, which were all consummated before trial. And that with regard to the Villeneuve property, that we receive our fair share of the value at the time they terminated him pursuant to the Villeneuve contract, which said you can fire a partner for not making other contributions. And we admit, Mr. Alwan said, no, I don't want any part of that. And they valued it on the tax return at about just shy of $400,000. They purchased it for He paid his fair share of that mortgage, and he should have gotten a twelfth essentially of the net value of that property before they embarked on the mortgages and the massive development. That was the relief we asked the court for, and we provided, I submit, we provided the documentary evidence to show how that was calculated. We showed our math for that. So the trial court's ruling was that your client was wrongfully expelled from all three partnerships. It was interesting because I spent the whole trial saying Villeneuve is different, because Villeneuve does let them do that. The other two do not. He swept across all three and said, he shouldn't have been terminated from all three, except we're agreeing we should have been terminated from Villeneuve because we said we were not going to participate in any further contributions. So he found, in my opinion, he found correctly that we were wrongfully terminated from two of the groups, Centennial and Kickapoo Edwards, but that we urged him to find that we were properly terminated from Villeneuve, but they didn't follow their own contract in valuing our partnership interest in paying us. I hope that answers it. Well, I'm not entirely sure, because there's, if you drop your claim with respect to Villeneuve, then there's nothing with respect to Villeneuve. I didn't drop my claim. What we dropped was the claim to be reinstated in a project, which after they terminated us, they took out multimillion dollar mortgages in a failed development. We can't be tied to what they did after they fired him. It would be like saying if a legal partnership terminates an attorney, that he's responsible for all the at the time you terminated us before they went off on this borrowing spree, which got the corporation in a lot of debt. Villeneuve and Kickapoo Edwards, by the time we got to trial, all of their properties had been sold. There's nothing left in those two corporations, their two entities. So what the court is asking us to do is go back to two partners that didn't have anything to do with this and came in after we were gone and try and negotiate payment after we've been litigating 17 years and the court pointed out that there was no goodwill left between the parties by which to do that. I mean, I don't know how we would even try to do that, and I don't understand. My attitude was this. The court has our numbers and it has their numbers. Pick one side and go with it. He punted on all of them saying it was too complicated, and I understand this. I mean, any party that is seeking money damages has an obligation to prove the damages, including a reasonable way to calculate them. So even on the counterclaim, that's sort of what happened. Both sides can lose on claims for damages, can't they? They can, but the court didn't rule that way, and what we're appealing is the court did not fix our damages. And again, I would go back and I could point you to documents in the record where we set out, here was the mortgage for Centennial Properties, that's A40. Here is the purchase price of Villeneuve, that's A47, and Kickapoo Edwards is A49. Those summaries show what the purchase price was, referencing the exhibits we introduced into evidence, and showing how much William Owen paid and that he paid more than the base mortgage price on all of those. That relates somewhat to the counterclaim, but it shows that he was at least in good standing as far as the mortgages. The summary sheet that they've attacked so much, that's A39, which was just a summary of, as it says right on there, the different exhibits it was referencing, shows all of the sales. And we made calculations, and in my reply brief, I laid out, here's the base price of what our share would be, and then the court can apply whatever interest rate it thinks is appropriate to non-payment. So I think we did give the court a framework with exhibits taken from property records and sales records to show what we were doing. I can address the counterclaim at this point if that's acceptable, if there are no other questions. I have a question. Yes. You say that you gave the trial court a framework for establishing damages. Is that enough? It seems to me that you needed, as plaintiff, and as far as counterclaim goes as well, give the court more than a framework. You needed to give the court a specific request. Am I wrong about that? No, but we did use these exhibits to make a specific request at the end of the case. And perhaps framework was the wrong term, but when you look at A39, which was our summary, for instance, in Centennial, it goes to exhibit C8 and shows a sale in 1977, shows the sale amount, what William Alwan's share would be, how many years, and what it would be with 8% interest. C9 is a sale in 1996, and down the line. These are all references to exhibits that are in evidence that show sale of a property where we maintain William Alwan never received anything from that property. So I think we've given them the base amount, the number of years that you would calculate interest, and an estimate if you were using 8% compounded, but obviously the court could choose a different interest rate. That's not our, I mean, that's what we were suggesting. But those numbers are what we asked the court for in exhibit A39. In my brief, at the very tail end, I laid out what the base amount was and then left it to this court to decide if you were going to remand with instructions to assess damages to specify what interest rate you believe would be appropriate under the circumstances to apply to those if it was not 8%. So I think we did ask for specific amounts based on specific documents. When I say framework, it was a sort of a lattice that said, okay, go to this exhibit for this sale, go to this exhibit for that sale. Here's our calculation as to what the mortgages were. We paid that, so we should just receive one-eighth of the total. Did the trial court's or distributions would have to be dealt with during wind-up? Yes and no. He mentioned that at least two of the documents, that is Centennial and Kickapoo-Edwards did have mechanisms to say the parties could have unequal capital contributions, and that the method of resolving a partnership share would take into account those differing capital accounts or those different contributions. But the court went on to find, which I think was appropriate, that because there are no documents for these sales that we were talking about other than one, that is the one closing statement that came out in their economic experts' deposition where Centennial wound down the last of their property, and I'll talk about that in a second, but for all the other transactions, we have no closing statements, so we don't know what the partnership share accounts were. Nobody can say what the various contributions were of the other partners because that evidence was not put in for all partners for all groups, so that was one of another of our argument. It looked like they were just preparing documents for my client and the other plaintiff and no one else, and when my client, his wife, and his son all testified that at various times they said, can you show us how you figure out how you're figuring we're behind, everybody said, no, we don't have those records, or we won't give you those records. In fact, the manager said in one of the termination letters, you are cut off from access to the partnership records, which is, that's contrary to the statute. Right, but now in litigation, and there's been a few years of it, I assume you've been able to get access to whatever records are there, through discovery, is that right? Yes, and I think if you look at the record in this case, that is everything we could scrape up, and for the most part, we've got one closing statement on Centennial, and we've got some tax returns, but we're missing giant swaths of seven, eight, ten years of tax returns for most of these groups when they were selling property, and we don't have closing statements for virtually 90 percent of the closings, so I don't know what we would, you know, that's what they produce, that's what we produce, there is, nobody has the records that you would need to do a proper evaluation here, and my argument is, as I refer to my client as a passive investor, yes, he was a general partner, but he never maintained the records, he never had them, numerous people have said they did have the records at one point or another, but he never had them, but they've also said what they had, they gave to your client's attorney. Well, they is not the legal counsel, they is not Mr. Crumpy, they is not, it is literally one manager who contradicts himself by saying at one point all I had was two checkbooks, and from another point said I gave all the records, and two, we have our discovery, I mean, we produced what they gave us, there is nothing, none of that was produced in the case. Now, they can say, well, we gave it to the other attorney, but that presumes that every attorney in the case gave away documents and didn't keep copies, that the accountant gave away records and didn't keep copies, that the parties gave away records and didn't keep copies. Well, just one final question as your time is up here, but when did that transfer to the former attorney take place? I have no idea, it just, this testimony just came out of the blue, like we gave it to Tiemann, and that's why I euphemistically referred it to, we gave it to Tiemann argument, because whenever I said where are these records, they said, well, at some point we gave them to Tiemann. That's all I know, Mr. Tiemann has not been involved in this case for seven, eight years, he says he produced his file, the counsel at some point, and none of that stuff was in there. If I could just have two minutes on the counterclaim, I just asked for Lee to do that. Two minutes is way too long, I'll give you a half a minute. Half a minute. If you look at our A40, A47, A49, those three exhibits map out what the mortgages were on each property, how much William Alwine paid, and he paid more than the mortgage amount for every property in all three groups. And their attorney who testified, testified off letters from his brother, and when I asked him specifics about what he was basing it on, or if he could split it between the different corporations or entities, he said no, it was just a gross amount, and he just attached it, and said he was looking at the mortgages, but our evidence is clear, concise, and absolutely shows that Mr. Alwine paid more than the mortgage amount. Okay, Justices Doherty or Harris, do you have any questions about that? No, thank you. Thank you. Okay. You will have rebuttal, and assuming counsel brings up the counterclaim, you can further address it at that time. One little housekeeping matter, when I opened court a identified the number of this case being 422-0088. I think I failed to say the name of the case, which is, I guess, quite obvious now. Alwine v. Kickapoo Edwards, land trustee, and others, better late than never, better late than never, and I apologize for not mentioning it earlier. Mr. Crumpy, you may proceed with your argument. Thank you, Judge. My name is Jeff Crumpy. I represent the three partnerships in this case, and I think my biggest problem with this appeal on Mr. Ryan's part is I do not understand, and I did not understand at trial, what his cause of action was. The trial court did not understand what his cause of action was and asked him repeatedly in closing, what is your cause of action? What is the relief you want? I still don't understand it, and as I raised in my brief, he has never pled a violation of the Applicable Partnership Act. His predecessors haven't done that. They tried to do it in 2018 and failed. They tried to, after an interlocutory appeal made it clear that the wrong Partnership Act was being pled, they tried to amend their pleading in 2018 by adding a count alleging a violation of the Appropriate Partnership Act, the current act, and that was dismissed. It was stricken by Judge McCuskey in 2018 when he found that it was inviolate of the statute of limitations. Mr. Ryan just ignored that and continues to ignore it and sought that relief anyway in the trial court, and he sought it. He mentioned it today. He said, I want a valuation done, a proper buyout of my client as of 2004 when they were terminated or when we tried to terminate. That's the relief that they sought in 2018 and that the trial judge said is not available. The trial judge invited Mr. Ryan's predecessor to appeal that if he didn't like that legal ruling. He did not do it in an interlocutory fashion and he did not do it after Judge Brown issued his final judgment order in this case. It's not before the court. It's waived. So my position is Mr. Ryan and his predecessors have waived all claims that the current Partnership Act was violated by my clients. It's not pled in any of the pleadings and the prior ruling dismissing an attempt to make that cause of action has not been appealed. What's your position on the status of the Villain Wave Partnership? Plaintiff says that he abandoned that claim for wrongful termination. The trial and it was never on a pleading. It was I think there was a statement to that effect in court, but then the case proceeded forward on the same pleadings. The trial judge ruled on the termination from all three partnerships. So what's your position as to where that stands? My position is counsel got what he asked for. His predecessors pled for that relief that he asked for declaratory judgment that his client be found to have been improperly terminated from all three partnerships. And that's exactly what he got. You can't stand up at closing argument as a lawyer. It's not evidence and make an argument. Hey, I abandoned this. I don't want to be found to have been improperly terminated from Villain Wave, not the other two, because the evidence showed that the only two that made any money were the other two. So that's why he said that in closing arguments. I don't really understand why he thought that would work, but he got what he asked for and now he's appealing that. So my position is Judge Brown heard all of this evidence and received a voluminous evidentiary documentation and did the best that he possibly could to unravel what had happened over the decades and found that Mr. Ryan's client was not properly terminated from any of the partnerships. I don't quarrel with that. And you don't dispute that? No, I don't quarrel with that. Are some of these issues that Mr. Ryan wants to talk about now still ripe for being addressed when it comes time to wind up? Yes, I believe so. You know, Mr. Ryan, even today, just continually refers to mortgages and payments on mortgages, and that's just wrong. What he's referring to is his client's alleged payments on the contracts for the properties at issue with these partnerships. I just don't quite understand why he continues to make those types of arguments. But contrary to what he says, the court will find thousands of pages in the record of he says that there are no other documents regarding sales. That's not true. There's thousands of pages in the record introduced by me regarding sales of Villanova lots and other lots. He says that he wants to be the court to consider on remand what the value of various sales were. He does nothing with respect to what the costs associated are. He says nothing about that. And Judge Brown rightfully pointed that out in trial. He's like, you think you're entitled to a certain percentage of sales, but you never discuss what the costs are related to the sales. So in other words, your position is it has to be net sales. Yeah, if there's any analysis to be done and the records that we submitted that were admitted with respect to the Villanova lot sales all include the costs, by the way. So the accountant that was hired by me to testify clearly went through that and did the best that she could with the records that we had and showed that there was a pretty big net loss at the end of the Villanova lot sales. So there is a lot of documentation. There is a lot of documentation missing. That is true. Judge Brown heard from a lot of witnesses regarding what I think he rightfully concluded that there was conflicting testimony about the destruction of some documents, by the way, done by one of the plaintiffs, not Mr. Ryan's client, but the other one. There was also some disputes about whether documents were provided to Mr. Alwyn's attorney before Mr. Ryan, this mystery team and issue that we referenced. And there were evidence that some of the documents were just gone, tax returns that were decades old. However, Judge Brown rightfully observed that Mr. Alwyn didn't produce any documents and he should have had his own tax documentation with respect to sales and K-1s and partnership tax returns, and he didn't have he testified that his records burned up at his store. So there's all kinds of testimony all over as Judge Brown observed. And I think he rightfully concluded that all of the general partners had partnership obligations to each other. And he was correct in not taxing my clients with any presumption that they'd done anything improper. What about Corey? Does that suggest that your clients were in a position of trust with respect to holding the records and therefore presumption should work against them? I don't think so, Judge, because over time, Corey also says that each partner in a general partnership owes a fiduciary duty to the others. And that's what Judge Brown found. He agreed with that. And I think Mr. Ryan agrees with that too. We all do. And over time, different partners controlled access to the partnership records, and that changed over time. And at one point, attorney Phil Corey's brother was the managing partner, and he maintained the records. And by the way, Mr. Ryan's repeated reference to a lack of any records except those records related to his client and the other plaintiff is wrong. There are handwritten partnership records admitted into evidence maintained by Mr. Corey, Gerald Corey, when he was the manager of every payment made by every partner. And they, the court will also observe that there was testimony from Mr. Ray Fool's daughter, I believe, during trial where I showed her the documents. And she said, yes, that's my father's handwriting. Those are his handwritten records of every payment every partner made when he was the managing partner. So for Mr. Ryan to claim that there aren't records is, of course, false. There are plenty of records. He just doesn't like the records, and he doesn't like the fact that they're handwritten. Well, guess what? This was back before there were computers, before there was an internet. All the records were handwritten. And they were authenticated at trial. And they clearly showed with respect to the counterclaims, it is my position, that the only two partners that were deficient in their contributions, not towards mortgages, towards payment of the they all signed documents buying this real estate and promising to make their contract for deed payments. The only two partners that did not do that were Mr. Alwyn and Mr. Ray Fool. And that's what the handwritten records show. And it's my position, that's what was admitted at trial. And that's what Mr. Phil Corey testified to on the stand. There was not one contradictory witness that disputed his calculations. Counsel, in regards to all of the issues that have been presented on appeal, both by appellant and appellees, are there any issues subject to the de novo standard of review? Are they all subject to the manifest weight of the evidence standard? They're all subject to the manifest weight of the I don't have anything else to add with respect to the counterclaims. I understand Mr. Ryan's argument that he showed Phil Corey documents when he was testifying and asked him, did you use these documents to make your calculations? And Mr. Corey may have said no, or I don't know on occasion, and that that is being argued to impact his credibility, perhaps. But my position is there were written documents, contemporaneous records of the partnerships that showed the default amounts when Mr. Corey prepared the notices trying to kick out Mr. Alwyn and Mr. Ray Fool, that those amounts are contained in his counterclaims that he filed. And that it's just a simple breach of contract claim that was made in those counterclaims and that that was proven. Judge Brown really doesn't talk about that at all in his order. He just says at the very end, all further claims and counterclaims are denied or words to that effect. So my position is that is against the manifest weight of the evidence because he just doesn't discuss it at all. And the evidence of trial was pretty clear, establishing the amounts of the counterclaims what was owed. Judge Brown does say he believes that these two plaintiffs were behind. He just is not sure how much. Isn't that your obligation to show how much? Absolutely. It is our obligation. And I believe we did that with Phil Corey and his testimony and the documents he used. Well, why didn't the trial court agree with your assessment then? I don't know. He doesn't comment on it at all in his judgment order. So I'm left to not. That's why I claim that is against the manifest weight of the evidence. That's the only reason I make that assertion. One thing I think that's interesting and feel free to interrupt me, obviously, if the court has any questions, but Judge Brown does point out with respect to Villanueva. And this goes towards Mr. Ryan's argument that somehow that one should be treated differently. He made that same argument at trial, too, which, of course, was rejected because it wasn't pled and there was no evidence to support it. And in his order, Judge Brown said, you know, if I was going to treat this differently, you had the duty to tell me, provide me evidence with respect to the assets and liabilities of Villanueva at the time you were wrongfully disassociated or properly disassociated with it. And you didn't do that. The only evidence that I see in the record is a reference to an appraisal that was conducted, you know, retroactive appraisal that Mr. Ryan's predecessor had done that showed that the real estate was worth less than what they bought it for. So it was it was underwater at that time when his client was kicked out or when we tried to kick him out. He'd like to he'd like to disavow that now, because, of course, it's not good for his position. It's not supportive of his claim. And he didn't provide it. His predecessor did. But I think it's pretty instructive. And I thought that was good that Judge Brown latched on to that and said, hey, it's referenced in the accountant's analysis. And nothing contrary was provided at trial. So I think basically Judge Brown did a very good job, his rulings, but for his failure to consider the counterclaims really are not against the manifest way to the evidence. He did the absolute best that he could. I don't dispute his ruling that Mr. Alwyn was wrongfully removed from all three partnerships and should share in the profits and the losses of each. Thank you. OK, I see no questions. So thank you. And Mr. Ryan, now you have rebuttal if you so choose. I will be as brief as I can. With regard to some of those last points on Villeneuve, the appraisal was done 10 years or so after or more after 2005, which was when my client was terminated. Phil Khoury, who testified, agreed that my client was terminated from Villeneuve. We looked over the Villeneuve contract and the partnership agreement and all the agreements that were there. One of them flat out says, and I can point you to that, that all the contract, everybody had kicked in $42,000, which was exactly the amount of the contract for D divided by 8. So they had all kicked that in. Also, Villeneuve was unique in the fact that it had a term that said, if you do not make your capital contributions, we're not even talking mortgage, just general capital calls, they can terminate you if they so choose. What we were saying is they breached the contract by not valuing our interest and then distorting the value of the company. So when he says there's no evidence, we took the tax return from 2005, which their accountant said would fix the value at the end of 2004, just before they terminated him. And and divided it by 8. So, I mean, I don't know what other information we could have because they didn't produce any information on what their costs were to date. They didn't produce any evidence as to what should be subtracted from that. And I will say on that point, I raised from the opening statement, the fact that I felt that the Villeneuve should be treated differently because there were contractual terms that allowed for termination and had a mechanism for valuing the partnership agreement in the contract. So that claim is pure breach of content. It's right there. It's breach of contract. It's basically they failed to follow the contract. But isn't it incumbent on you if you're going to drop a claim to file some amendment that makes clear for the record what your claims are and are not? It seems a little bit problematic to wade into closing argument and say, oh, by the way, we're keeping that claim, but dropping this part of that claim. Well, I understand the court's point, and I would agree that I, you know, I got in very, very late on this to help a colleague who was undergoing chemotherapy to try the case. So I did not have the leisure of examining the file in the detail that I would have liked. Having said that, from opening statement, I made that claim. They objected, and I pointed out to the court that we were making that claim because we felt that contract was different. So we went into the trial with that argument. You're pleading say otherwise. I agree. That's how the judge rules. But the court is to do equity based on the proof at trial, not necessarily tied particularly to the complaint. And I do believe that at the end of the case, what we have here is a situation where at least in equity, if nothing else, you can't say after the hen house has been raided that my client has to go back and figure out how many chickens and eggs were in the hen house when nobody kept records. They sold off all of the assets and distributed them while we were in while the litigation was going on. There's nothing saying the court approved of the effective dissolution of these groups, Kickapoo, Edwards, and Centennial, during the litigation. Nobody brought that to the court's attention. Talking about my client's records, all he would have gotten was K1s. He testified he got K1s. He didn't get the tax returns. He didn't play a role in formation of the tax returns. And again, my client said over and over again, when I asked them for records, when I asked them for details to explain why I was behind, they would not give it. So they keep saying, well, we've got all this evidence. Well, they never showed any of that to my client. They didn't show it to anybody that I know. And they don't have those records to show at this point in time. Our damage claims are based on the tax return from Villeneuve from 2005. And with the other two, it's based on what we know about the sales that we could dig out from the recorder of deeds. And I agree, in a perfect world, we would have all the expenses that would be subtracted from that. We don't have those records. We don't have the tax returns. How would that be equity? Because it would grossly overstate your client's recovery if you count only the revenue, not the costs. That is where the issue of whether the court could properly assess a burden on the defendants being the keeper of the records to not have produced those records and to have refused to produce those records when they were requested back in 04, 05, 06. Which of the defendants before the court would bear that burden? I believe Corey had the records at one point. I mean, it went from hand to hand to hand, all partners that were not my client. Most of them are dead now. Their estates may be parties to the case, but that's all we've got is there were various partners held the records. I did not try and parse that out because everyone said, well, either I didn't get them or they were not. In Corey's case, it appears that the records were destroyed after his death by his son, according to some testimony in the case. I recognize this is a problem for the court, but what remedy does a plaintiff have when he sues to be reinstated in partnerships in 2005 and by 12 years later, when the trial happens, basically there's nothing left to go after because they've sold it all and distributed it all. That's the problem we have. That's where I think the court erred because he gave us literally an impossible situation. Okay. Thank you, Mr. Ryan. You're out of time. Thank you. Also, thank you, Mr. Crumpy, for your argument. The case is now submitted to the court and we will stand in recess until further call.